

**FILED**

9:46 am, 5/24/21

**U.S. Magistrate Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

THE UNITED STATES OF AMERICA

                Plaintiff,

vs.

THEODORE EUGENE GARLAND,

                Defendant.

Case No: 20-CR-173-MLC

---

### Findings of Fact and Conclusions of Law

---

This Court having considered and evaluated the evidence and legal arguments presented finds:

**Count 1:** Defendant Theodore E. Garland is **GUILTY** of Violating a Closure, as charged in the Information, occurring on or about June 2, 2020, within the boundaries of Yellowstone National Park.

**Count 2:** Defendant Theodore E. Garland is **NOT GUILTY** of Guiding to Disturb Wildlife, as charged in the Information, occurring on or about June 15, 2020, within the boundaries of Yellowstone National Park.

**Count 3:** Defendant Theodore E. Garland is **GUILTY** of Not Leaving the Area in the Same Condition as it Was Found, as charged in the Information, occurring on or about June 25, 2020, within the boundaries of Yellowstone National Park.

**Count 4:** Defendant Theodore E. Garland is **NOT GUILTY** of Violating a Closure While Guiding, as charged in the Information, occurring on or about June 25, 2020, within the boundaries of Yellowstone National Park.

**Count 5:** Defendant Theodore E. Garland is **GUILTY** of Foot Travel in a Thermal Area, as charged in the Information, occurring on or about June 22, 2018, within the boundaries of Yellowstone National Park.

**Count 6:** Defendant Theodore E. Garland is **NOT GUILTY** of Foot Travel in a Thermal Area, as charged in the Information, occurring on or about June 11, 2020, within the boundaries of Yellowstone National Park.

**Count 7:** Defendant Theodore E. Garland is **NOT GUILTY** of Foot Travel in a Thermal Area, as charged in the Information, occurring on or about June 4, 2020, within the boundaries of Yellowstone National Park.

**Count 8:** Defendant Theodore E. Garland is **NOT GUILTY** of Foot Travel in a Thermal Area, as charged in the Information, occurring on or about June 17, 2020, within the boundaries of Yellowstone National Park.

**Count 9:** Defendant Theodore E. Garland is **GUILTY** of Foot Travel in a Thermal Area, as charged in the Information, occurring on or about July 5, 2020, within the boundaries of Yellowstone National Park.

**Count 10:** Defendant Theodore E. Garland is **NOT GUILTY** of Aiding and Abetting a Closure Violation, as charged in the Information, occurring on or about July 30, 2020, within the boundaries of Yellowstone National Park.

**Count 11:** Defendant Theodore E. Garland is **NOT GUILTY** of Violating a Closure, as charged in the Information, occurring on or about June 2, 2020, within the boundaries of Yellowstone National Park.

**Count 12:** Defendant Theodore E. Garland is **GUILTY** of Violating a Closure, as charged in the Information, occurring on or about June 25, 2020, within the boundaries of Yellowstone National Park.

**Count 13:** Defendant Theodore E. Garland is **GUILTY** of Unlawfully Possessing, Destroying, Injuring, Defacing, Removing, Digging, or Disturbing a Mineral Resource From its Natural State, as charged in the Information, occurring on or about June 25, 2020, within the boundaries of Yellowstone National Park.

**Count 14:** Defendant Theodore E. Garland is **NOT GUILTY** of Creating or Maintaining a Hazardous or Physically Offensive Condition, as charged in the Information, occurring on or about January 16, 2020, through July 30, 2020, within the boundaries of Yellowstone National Park.

**Count 15:** Defendant Theodore E. Garland is **GUILTY** of Engaging in Activity Subject to a Permit Without Obtaining a Permit, as charged in the Information, occurring on or about June 2, 2020, within the boundaries of Yellowstone National Park.

## Findings of Fact

This matter was tried to the Court on April 7 and 8, 2021, with the United States represented by Stephanie Hambrick and Theodore E. Garland (hereinafter, "Defendant") represented by Alex F. Freeburg. The United States presented the testimony of Mr. Michael Johnson, National Park

Service Ranger Clinton Powell (hereinafter, "Ranger Powell"), Seasonal National Park Service Ranger Devon Beeny (hereinafter, "Ranger Beeny"). The Defendant presented the testimony of Ms. Lisa Merrell and Mr. Armando Fana. The Court finds the following facts:

1. This trial was in person. Both parties were physically present in the courtroom. Witnesses Mr. Johnson, Ms. Merrell and Mr. Fana appeared by video conference. Witnesses Ranger Powell and Ranger Beeny testified in person.

2. Ranger Powell was a Government witness. Ranger Powell is a District Ranger in Yellowstone National Park (hereinafter, "YNP") based out of the Lake District. He has held that title since 2017 but has worked for the Park Service since 2004. Among other duties, Ranger Powell is responsible for closing and opening certain sections of the Lake District to the public in YNP. Ranger Powell also has the burden of opening and closing specific trails within the Lake District.

3. Within the Lake District is an area of YNP called the Canyon Lands.

4. In the spring of 2020, most of YNP was subject to an emergency closure due to COVID-19 concerns in addition to the typical seasonal weather closures. Eventually YNP was opened to the public. However, trails in the Canyon Lands did not all opened at the same time.

5. The Brink of Lower Falls Trail and a portion of the North Rim Trail that connects the Brink of Lower Falls Trail to the Crystal Falls Trail were closed until August 15, 2020. The Brink of Lower Falls Trail is regularly closed due to weather conditions until spring, but normally opens once snowpack melts. In the Spring of 2020, the Deputy Superintendent's Office contacted Ranger Powell over safety concerns associated with the

Brink of Lower Falls Trail. As a result, it was closed for an assessment and eventually trail construction.

    a.   Government's Exhibits 52 through 57 were admitted. Exhibit 52 is a map of the Canyon Area. Exhibit 53 through 57 are photos illustrating safety concerns along the Brink of Lower Falls Trail.

6.   The Crystal Falls Trail is also located in the Canyon Lands area. It was initially closed in Spring of 2020 but opened sometime between June 15 and June 30, 2020. Crystal Falls Trail could only be accessed from the south, by way of the Brink of Upper Falls parking lot, because the North Rim Trail connecting Crystal Falls Trail and Brink of Lower Falls was not open until August 15, 2020.

7.   Closures of trails in the Canyon Area were not published in YNP's Backcountry Situation Report website. These trails are not considered by YNP as part of the backcountry, which encompasses those portions of the Park which are remote to the roadway system in YNP.

    a.   Defendant's Exhibit B was admitted, which is a webpage archive of YNP's Backcountry Situation Report.

8.   Ranger Beeny was a Government witness. Ranger Beeny was employed as a Seasonal Park Ranger in the Western District of YNP from April 26, 2020, to October 26, 2020. After Ranger Beeny's seasonal position ended, she accepted a job with CACI as a contractor for the Department of Justice. Ranger Beeny, through her position with CACI, works daily with the prosecutor in this matter. She was specifically retained for two calendar days by the National Park Service to give testimony in this case.

9.   On April 29, 2020, Defendant emailed a completed application to the YNP Commercial Use Office requesting he be allowed to conduct guided tours within the borders of YNP.

The application was signed by Defendant on April 27, 2020. On June 8, 2020, Defendant was issued a Commercial Use Authorization Permit to guide individuals and small groups within YNP. A letter attached to the permit informed Defendant that the permit was not effective until the YNP Commercial Use Office received a signed copy of it. Defendant signed the permit, making it effective, on June 10, 2020. The permit was issued subject to conditions.

    a. Government's Exhibit 7 was admitted, which is evidence of an email from Defendant to the YNP Commercial Use Office with an application attached.

    b. Government's Exhibit 8 was admitted, which is the application attached to aforementioned email.

    c. Government's Exhibit 9 was admitted, which is Defendant's permit issued by the YNP Commercial Use Office.

10. During the Summer of 2020, Ranger Beeny's supervisor contacted her with concerns from the Commercial Use Office in YNP about a commercial guide encouraging YNP visitors to violate rules and regulations on social media. That commercial guide was Defendant.

11. Ranger Beeny started by investigating a Facebook account her supervisor had discovered. The Facebook account was named Explore Yellowstone Like a Local (hereinafter, "Explore"). Ranger Beeny took screenshots of the account's pages and received a search warrant for the nonpublic data associated with the account. On the "About" page of the Facebook account, it provides contact information and a brief explanation that the account memorializes pictures and videos of Defendant's adventures in YNP and Grand Teton National Park. The email address provided on the "About" page matches the email address

used by Defendant when sending his permit application to the YNP Commercial Use Office. This Facebook account belong to, and is managed by, Defendant.

    a.  Government's Exhibit 3 was admitted, which is a screenshot of the About page for Explore's Facebook account.

12. The Explore's Facebook account was marketing a guidebook also titled Explore Yellowstone Like a Local. Ranger Beeny was given permission to purchase a copy of the guidebook. The guidebook, on page two, provides readers with a short autobiography about Defendant. It also provides contact information to readers who are interested in having Defendant personally guide their visit to YNP. The email address in the guidebook matches the email address provided in Explore's Facebook page and the email address used by Defendant when submitting his application to the YNP Commercial Use Office. Further, the guidebook tells readers about an Instagram account and a podcast named Explore Yellowstone Like a Local. The guidebook was created and written by Defendant.

    a.  Government's Exhibit 5 was admitted, which is a screenshot of Explore's Facebook account marketing the guidebook.

    b.  Government's Exhibit 1 was admitted, which is a copy of Defendant's guidebook titled Explore Yellowstone Like a Local published July 4, 2020.

13. Explore's Instagram account has photos of Defendant and photos of the guidebook. It references Explore's Facebook page and podcast. This Instagram account belongs to, and is managed by, Defendant.

    a.  Government's Exhibit 4 was admitted, which is a screenshot of Explore's Instagram account.

    b.   Government's Exhibit 6 was admitted, which is screenshot of Explore's Instagram page referencing the podcast, Facebook account and guidebook with the same name.

14. The podcast titled Explore Yellowstone Like a Local can be downloaded on Apple Podcasts. There are 18 episodes, ranging from about thirty minutes to an hour, that all focus on exploring YNP in a way only someone familiar with YNP could. Defendant is the only individual heard on the podcast. Ranger Beeny listened to each episode. The podcast references the guidebook, Instagram account and Facebook account. The podcast was created by, and is owned by, the Defendant.

    a.   Government's Exhibit 2 was admitted, which is a screenshot of the Apple Podcast Preview for Explore.

    b.   Government's Exhibits 301 and 302 were admitted, which are clips of Defendant's podcast from January 16, 2020.

    c.   Government's Exhibit 310 was admitted, which is an opening clip of Defendant's podcast.

15. Mr. Fana was Defendant's witness. Mr. Fana is a Floridian who visited YNP in the Summer of 2020. He discovered Defendant's podcast while trying to decide where to vacation with his family. Mr. Fana bought Defendant's guidebook through eBay. Mr. Fana also donated money towards Defendant's legal expenses in this matter.

16. On June 2, 2020, Mr. Fana, his family and Defendant entered YNP together. Defendant guided Mr. Fana and his family to Crystal Falls. In order to do so, Defendant and his group traveled on the North Rim Trail between the Brink of Upper Falls and the Brink of Lower falls and on Crystal Falls Trail. Crystal Falls Trail and the Brink of the Lower Falls Trail

were closed at this time and marked with closure signs. Mr. Fana testified he did not pay Defendant for his services. On June 5, 2020, Defendant and Ms. Merrell had dinner with Mr. Fana and his family.

    a. Government's Exhibit 10 was admitted, which is a screenshot of posts from June 2, 2020 on Explore's Facebook wall.

    b. Government's Exhibit 58 was admitted, which is an archive of YNP's Backcountry Situation Report.

    c. Government's Exhibits 304, 305 and 306 were admitted, which are recordings of Defendant's podcast from June 4, 2020.

17. On June 4, 2020, Defendant posted six separate photos of thermal features to Explore's Facebook account. Two of those thermal areas are also depicted in Defendant's guidebook. Ranger Beeny specifically identified one of the thermal features and recognized that all six of the photos were taken in the general area of the Sylvan Springs Group in Gibbon Meadows, located in YNP. The single specific thermal feature Ranger Beeny could identify was Government's Exhibit 35.

    a. Government's Exhibits 34 through 39 were admitted, which are screenshots of a series of photos posted to Explore's Facebook account dated June 4, 2020.

18. Ranger Beeny went to Sylvan Springs to locate the pools in the pictures posted to Explore's Facebook account. On August 26, 2020, she was able to locate one, of which she took photos. The thermal area Ranger Beeny took photos of is the same thermal feature in Government's Exhibit 35.

    a. Government's Exhibit 40 and 41 were admitted, which are photos taken by Ranger Beeny on August 26, 2020.

19. Ms. Merrell was Defendant's witness. Ms. Merrell is an Oklahoman who is in a romantic relationship with, and lives with, Defendant. In May and June of 2020, Ms. Merrell spent time in YNP with Defendant. She was with Defendant when he arrived home, in Oklahoma, on June 27, 2020. Ms. Merrell has access to Explore's social media accounts.

20. On June 14, 2020, Ms. Merrell was hiking with Defendant and her son near Mystic Falls, in YNP, when the group found what looked to be a "hotpot". A hotpot is simply a pool of warm natural water sealed, either naturally or artificially, from cold water. On June 15, 2020, Defendant was with Ms. Merrell and her son when they were lucky enough to see a Black Bear. A video of the bear was posted to Explore's Facebook and Instagram accounts. Ms. Merrell took the video in Government's Exhibits 110 and 211 and was responsible for posting said video to both Facebook and Instagram.

   a. Government's Exhibit 110 was admitted, which is a video posted to Explore's Facebook wall of the bear.

   b. Government's Exhibit 106 was admitted, which is Facebook's Business Record of the video in Exhibit 110.

   c. Government's Exhibit 211 was admitted, which is a video posted to Explore's Instagram of the bear.

   d. Government's Exhibit 202 was admitted, which is Instagram's Business Record of the video in Exhibit 211.

21. On June 17, 2020, Defendant posted a photo to Explore's Instagram of Defendant standing near a thermal feature in the Rabbit Creek area within YNP.

    a. Government's Exhibit 42 was admitted, which is a screenshot of a photo of Defendant standing near a thermal feature posted to Explore Yellowstone Like a Local's Instagram.

22. On June 22, 2020, Explore shared a Facebook Memory from June 22, 2018. A Facebook Memory is a post created by a user on that exact day some number of years previous. The Memory was a series of photos and a description explaining that Defendant and his partner overnight camped near Shoshone Lake, a location within YNP. One of those photos depicts Defendant standing near a thermal pool.

    a. Government's Exhibit 32 was admitted, which is a screenshot of Explore's Facebook.

23. On June 25, 2020, Defendant traveled on the Brink of Lower Falls Trail with what he calls a client. He took a video of the Brink of Lower Falls and posted that video to Explore's Facebook and Instagram accounts, along with discussing this experience on his podcast. Defendant, on that same trip, also visited Artist Point in the Canyon Area.

    a. Government's Exhibit 12 was admitted, which is a screenshot of Explore's Facebook post of a video of Brink of Lower Falls posted on June 25, 2020.

    b. Government's Exhibit 210 was admitted, which is a video Defendant recorded at Artist Point and found on Explore's Instagram.

    c. Government's Exhibit 109 was admitted, which is a video Defendant recorded at Artist Point and found on Explore's Facebook.

    d. Government's Exhibit 105 was admitted, which is Facebook's Business Record of the video in Exhibit 12 and Exhibit 109.

    e.   Government's Exhibit 203 was admitted, which is Instagram's Business Record of the video in Exhibit 210.

    f.   Government's Exhibit 13 was admitted, which is a screenshot of Explore's Instagram post of a video from Brink of Lower Falls posted on June 25, 2020.

    g.   Government's Exhibit 206 was admitted, which is Instagram's Business Record of the video in Exhibit 13.

    h.   Government's Exhibits 108 and 209 were admitted, which are the actual videos in Exhibit 12 and 13.

    i.   Government's Exhibit 309 was admitted, which is a recording of Defendant's podcast from June 27, 2020.

24. Also, on June 25, 2020, Defendant visited Mystic Falls. Mystic Falls is another waterfall within the borders of YNP. While there, Defendant created a swimming hotpot.[1]Defendant created the hotpot by moving rocks within the river to regulate the flow of the hot and cold water. Ranger Beeny was able to locate and dismantle this hotpot. Defendant discussed creating this hotpot on his podcast, in the guidebook, and on both of Explore's social media accounts. Defendant also posted videos of himself in the hotpot to Explore's social media accounts.

    a.   Government's Exhibit 14 was admitted, which is a screenshot of Explore's Instagram post of a video of Defendant sitting in a hot pot.

---

[1] Swimming or bathing in a natural, historical, or archeological thermal pool or stream of water originating entirely from a thermal feature is prohibited in YNP. 36 C.F.R. § 7.13(m). However, it is legal to wade in hot water which is flowing into a natural waterway, if that waterway is from sources not entirely thermal. Defendant was in a natural stream where hot water was flowing into the stream. He moved the rocks around to regulate the flow of hot and cold water to make a "tub" where the water was an appropriate temperature.

b.  Government's Exhibit 207 was admitted, which is Instagram's Business Record of Exhibit 14.

c.  Government's Exhibit 212 was admitted, which is the video at issue in Exhibit 14 and 207.

d.  Government's Exhibit 104 was admitted, which is Facebook's Business Record of an identical post to Exhibit 14 being posted to Explore's Facebook.

e.  Government's Exhibit 111 was admitted, which is the video in Exhibit 104.

f.  Government's Exhibit 308 was admitted, which is a recording of Defendant's podcast from June 27, 2020.

g.  Government's Exhibit 102 was admitted, which is Facebook's Business Record of Defendant discussing a potential hotpot he plans on investigating.

h.  Government's Exhibit 201 was admitted, which is Instagram's Business Record of Defendant discussing a potential hotpot he plans on investigating.

i.  Government's Exhibit 101 was admitted, which is Facebook's Business Record of messages discussing Defendant getting Mystic Falls hotpot "to work".

j.  Government's Exhibit 204 was admitted, which is Instagram's Business Record of an Instagram post by Explore of three people using the hotpot at issue.

k.  Government's Exhibits 15 through 30 were admitted, which are photos taken by Ranger Beeny while walking the path to the hotpot at issue via directions from Defendant's podcast.

l.  Defendant's Exhibit C was admitted, which is a picture of three unknown individuals in an unknown hotpot.

25. On July 5, 2020, Defendant posted a video of what he called Lime Geyser to Explore's social media accounts. The same feature is on page 60 of the guidebook. The location shown in the videos and depicted in the guidebook is actually called Crater Hills Geyser, which is found within YNP. Defendant took the video and can be heard talking while doing so. Ranger Beeny investigated the Crater Hills Geyser area, she took videos and photos during her investigation.

  a. Government's Exhibit 43 was admitted, which is a screenshot of a video of Lime Geyser posted to Explore's Facebook.

  b. Government's Exhibit 103 was admitted, which is Facebook's Business Record of Exhibit 43.

  c. Government's Exhibit 114 was admitted, which is the actual video in Exhibit 43.

  d.  Government's Exhibit 44 was admitted, which is a screenshot of a video of Lime Geyser posted to Explore's Instagram.

  e. Government's Exhibit 208 was admitted, which is Instagram's Business Record of Exhibit 44.

  f. Government's Exhibit 213 was admitted, which is the actual video in Exhibit 208.

  g. Government's Exhibit 45 was admitted, which is a photo taken by Ranger Beeny of the Crater Hills Geyser area.

  h. Government's Exhibit 46 was admitted, which is video of the Crater Hills Geyser taken by Ranger Beeny with her body camera.

  i. Government's Exhibits 47 and 48 were admitted, which are videos of Crater Hills Geyser taken by Ranger Beeny with a National Park Service cell phone.

      j.  Government's Exhibit 49 was admitted, which is a photo taken by Ranger Beeny of the Crater Hills Geyser surrounding area.

26. On August 5, 2020, Defendant reported to the Concessions Management Office, as required by his permit, that he guided four tours within YNP in June 2020. During those guided tours, Defendant did not use a commercial vehicle or commercial equipment.

      a.  Government's Exhibit 11 was admitted, which is a Monthly Use Report submitted to the Concessions Management Office of YNP by Defendant.

27. Mr. Michael Johnson was a Government witness. He is a Kentuckian who was subpoenaed to testify before the Court by the Government. In return for his testimony he and his son were granted immunity from future prosecution related to their past conduct within the borders of YNP.

      a.  Government's Exhibit 51 was admitted, which is the written immunity agreement between Mr. Johnson and the Government.

28. In 2020 Mr. Johnson planned a trip to YNP. During preparation, Mr. Johnson listened to Defendant's podcast and purchased his guidebook. Mr. Johnson discovered the existence of the guidebook listening to the podcast and was able to purchase the guidebook through Defendant's Facebook account.

29. In the guidebook and in the podcast, Defendant discusses cliff jumping at an area in YNP called Firehole. Mr. Johnson read this section of the guidebook and listened to that part of the podcast. In both the guidebook and podcast, Defendant explains that cliff jumping is illegal in YNP and can be dangerous but suggests visitors do it anyway. Mr. Johnson planned to cliff jump at Firehole when he visited YNP. Mr. Johnson used no other sources while planning his visit to the Firehole area.

    a. Government's Exhibit 307 was admitted, which is a portion of Defendant's podcast discussing cliff jumping in YNP.

30. Mr. Johnson arrived at YNP with his family on July 27, 2020, and left on August 1, 2020. Using Defendant's podcast and a YNP map, Mr. Johnson was able to find the Firehole area on July 29, 2020. Once at the Firehole area, Mr. Johnson and his family discovered it was closed due to COVID-19 precautions. The Firehole swim area was closed for the entire Summer of 2020. They ignored the closure and preceded to cliff jump and swim. Videos of Mr. Johnson and his son jumping off cliffs at Firehole were taken that day.

    a. Government's Exhibits 112 and 113 were admitted, which are videos of Mr. Johnson and his son cliff jumping at Firehole.

31. Mr. Johnson sent those videos, and a picture of him and his son standing next to a closure sign at Firehole, to Defendant via Facebook Messenger. Over Facebook Messenger, Mr. Johnson was given Defendant's cellphone number and asked to send both the videos and photo via text message. The phone number provided to Mr. Johnson matches the phone number on Explore's Facebook page. Eventually those videos were posted to Explore's Instagram account.

    a. Government's Exhibit 31 was admitted, which is the video of Mr. Johnson's son jumping off cliffs at Firehole posted to Explore's Instagram.

    b. Government's Exhibit 107 was admitted, which is Facebook's Business Record of Mr. Johnson sharing said videos and picture with Explore over Facebook Messenger.

    c. Defendant's Exhibit A was admitted, which is Facebook's Business Record of Mr. Johnson discussing hiking in YNP with Explore.

32. Mr. Johnson and Defendant were never in YNP together. For the entirety of Mr. Johnson's

visit to YNP, Defendant was not physically present in YNP.

   a. Defendant's Exhibit D was admitted, which is a screenshot of Yellowstone

   National Park's Instagram page.

## Conclusions of Law

**A. Violation of a Closure**

Defendant was charged with four violations of 36 C.F.R. § 1.5(f). Counts one, ten, eleven and

twelve of the Information are all alleged violations of § 1.5(f).[2] § 1.5 gives the Superintendent of

YNP the authority to close all or portion of the park for various reasons. In order to do so, the

Superintendent must provide a written document justifying the closure, along with reasons for the

closure and why a less restrictive measure will not suffice. In pertinent part, § 1.5 reads:

   a. Consistent with applicable legislation and Federal administrative policies, and
   based upon a determination that such action is necessary for the maintenance of
   public health and safety, protection of environmental or scenic values, protection
   of natural or cultural resources, aid to scientific research, implementation of
   management responsibilities, equitable allocation and use of facilities, or the
   avoidance of conflict among visitor use activities, the superintendent may:
      (1) … [C]lose all or a portion of a park area to all public use or to a specific use
         or activity.
      …
      (3) Terminate … a closure … under paragraph (a)(1) ...

   b. Except in emergency situations, a closure … which is of a nature, magnitude and
   duration that will result in a significant alteration in the public use pattern of the
   park area, adversely affect the park's natural, aesthetic, scenic or cultural values,
   require a long-term or significant modification in the resource management
   objectives of the unit, or is of a highly controversial nature, shall be published as
   rulemaking in the Federal Register.

   c. Except in emergency situations, prior to implementing or terminating a …
   closure, the superintendent shall prepare a written determination justifying the
   action. That determination shall set forth the reason(s) the …closure authorized

---

[2] Count ten is discussed in Section D.

by paragraph (a) has been established, and an explanation of why less restrictive measures will not suffice … [t]his determination shall be available to the public upon request.

   …

e.  Except in emergency situations, the public will be informed of closures … and the termination or relaxation of such, in accordance with § 1.7 of this chapter.

f.  Violating a closure … is prohibited.

36 C.F.R. § 1.5 (modified)

As cited above, § 1.5(e) requires, except in an emergency, the public be informed of closures in accordance with 36 C.F.R. § 1.7. According to § 1.7, whenever the Superintendent exercises his authority under § 1.5, he must notify the public in a certain way and compile a writing, updated annually, of all the closures. In pertinent part, § 1.7 reads:

(a)  Whenever the authority of § 1.5(a) is invoked … to designate all or a portion of a park area as open or closed … the public shall be notified by one or more of the following methods:

  (1) Signs posted at conspicuous locations, such as normal points of entry and reasonable intervals along the boundary of the affected park locale.
  (2) Maps available in the office of the superintendent and other places convenient to the public.
  (3) Publication in a newspaper of general circulation in the affected area.
  (4) Other appropriate methods, such as the removal of closure signs, use of electronic media, park brochures, maps and handouts.

(b)  In addition to the above-described notification procedures, the [S]uperintendent shall compile in writing all … closures … imposed under discretionary authority. This compilation shall be updated annually and made available to the public upon request.

36 C.F.R. § 1.7 (modified)

Defendant argues that the Superintendent has not complied with the requirements of § 1.5 and § 1.7. Because of the failure, Defendant believes the closure was unlawful and therefore unenforceable. The Court disagrees. The Superintendent's Compendium is a summary of YNP's specific rules implemented under 36 C.F.R. It is updated yearly and signed by the Deputy Superintendent and Superintendent. Applicable to Defendant, the Compendium was updated and

signed September 12, 2019. On page 16 of the 2019 Compendium, Section 5 states, "[c]onstruction or demolition areas are closed to public access except where a designated route and means of travel has been established by the Superintendent." The determination given by the Superintendent is that the closure is necessary for public and employee safety, as well as resource protection. This suffices as a compilation of construction closures in writing. The Compendium is also updated yearly and available on the National Park Service website. Therefore, the Superintendent has complied with § 1.7.

Arguably, the Superintendent has failed to give any explanation as to why less restrictive measures will not suffice, which is required by § 1.5. This would require an overly technical and nonsensical reading of the Compendium. The Compendium states the reason is public safety and allows for the establishment of designated route in the construction area when possible. The hazards of allowing the public in a construction area, especially on the face of the Canyon, are self-evident. There is no evidence that the closure extended beyond the areas of the construction and the exhibit photos clearly establish the potential hazards of the area. The Court finds, as far as any argument about the legality of the closures at issue, the Superintendent has adequately complied with § 1.5 and § 1.7. It must be noted had the United States simply charged trespass pursuant to 36 C.F.R. §2.31(a)(1) the entire discussion of the Compendium could have been avoided.  The procedures for closures pursuant to the Compendium are directed to substantial long-term closures such as exists with Bear Management Areas. Nevertheless, the Superintendent included construction within the Compendium creating a valid closure.

### i.   <u>Count 1</u> – Crystal Falls Closure

36 C.F.R. § 1.5(f) simply states violation of a closure is prohibited. The Government must only prove there was a closure and Defendant violated that closure. In Count 1, the Government alleges

Defendant violated a closure at Crystal Falls on June 2, 2020. Ranger Powell testified that the Crystal Falls Trail was closed until sometime between June 15, 2020 and June 30, 2020.

Defendant, in his podcast, explains exactly what happen at Crystal Falls on June 2, 2020. He was guiding Mr. Fana and his family within YNP and decided to take them to the Canyon Lands area. They discovered Crystal Falls Trail was closed. The closure was evidenced by closure signs. Exhibit 305. Defendant admits they simply walked right past the closure sign. *Id*. He believed there was no good reason to have the trail closed. In fact, Defendant goes as far as telling his listeners to ignore all the closure signs in the Canyon Lands area and assures them the risk of receiving a ticket is low because budget cuts have led to fewer Park Rangers. Exhibit 306. The Court has no difficulty finding that Defendant violated the closure at Crystal Falls on June 2, 2020.

As such, the Court finds that the government has satisfied its burden. With respect to Count 1, charge of Violating a Closure pursuant 36 C.F.R. § 1.5(f), the Court finds that Defendant is **GUILTY**.

ii.    <u>**Count 11 and 12**</u> **– Brink of Lower Falls Closure**

Ranger Powell, pursuant to orders from the Deputy Superintended, left the Brink of Lower Falls Trail closed in the Spring of 2020. While it typically opens to the public once snowpack melts, it was left closed so an assessment of safety concerns could be done. Enough concerns were found that it was determined the trail required significant repair. Exhibit 53 through 57. The trail did not open to the public until August 15, 2020. Portions of the North Rim Trail were also closed. Prior to August 15, 2020, it was impossible to access Crystal Falls from the north. The only access to Crystal Falls was from the south, near the Brink of Upper Falls.

On June 4, 2020, Defendant posted to Explore's Facebook account a video of Yellowstone River near Chittenden Bridge, in the Canyon Lands area of YNP. He also discussed guiding a

Florida family that week, which was Mr. Fana and his family. On that same day Defendant talked about similar things on his podcast. Exhibit 304. On June 2, 2020, he claims to have taken Mr. Fana and his family to the falls in the Canyon Lands area. *Id*. As was discussed in Count 2, Defendant openly admits on his podcast he ignored the closure sign at Crystal Falls on June 2, 2020.

The evidence before the Court suggests Defendant was in the Chittenden Bridge area and Crystal Falls area on June 2, 2020. Defendant also encourages listeners of his podcast on June 4, 2020, to ignore closure signs, specifically at the Brink of Lower Falls. However, there is no evidence that Defendant was ever on Brink of Lower Falls Trail on June 2, 2020. Unlike Count 2, he does not discuss walking past closure signs on the Brink of Lower Falls Trail on June 2, 2020. The Government does not have photos or videos from Explore's social media pages of the Brink of Lower Falls Trail from June 2, 2020. Defendant was certainly in the area with a group of people and openly encouraged listeners of his podcast to violate closure signs there. But, the Government has not provided evidence that Defendant, beyond a reasonable doubt, violated the closure at the Brink of Lower Falls on June 2, 2020.

As such, the Court finds that the government has fail to satisfy its burden. With respect to Count 11, charge of Violating a Closure pursuant 36 C.F.R. § 1.5(f), the Court finds that Defendant is **NOT GUILTY**.

Defendant, though, did violate the Brink of Lower Falls closure later in June. On June 25, 2020, Defendant posted a video from the Brink of Lower Falls to Explore's Facebook and Instagram accounts. Exhibit 12 and 13. Defendant discussed June 25, 2020, in his podcast as well. Defendant claims he knew Brink of Lower Falls Trail was closed, so he and a client intentionally got to the trail very early in the morning to avoid being detected by park employees. Once at the

trailhead they went around the closure barriers and continued down to the lookout. Defendant tells his listeners to look at the videos he posted to Explore's social media accounts and boasts about being alone at the Brink of Lower Falls due to the closure.

In the podcast Defendant claims he and his client were coming back from the Brink of Lower Falls when they encountered a Park Ranger. He allegedly had a conversation with the Park Ranger about when the Brink of Lower Falls Trail would open. Defendant's counsel argues, since this Park Ranger did not ticket Defendant, the on-site YNP employee effectively revoked the closure. The Court has no reason to believe the unidentified Park Ranger saw Defendant actively violating a closure. There is also no evidence that the Park Ranger was a law enforcement ranger rather than an interpretation ranger. Even if a law enforcement Park Ranger knew Defendant had just violated a closure, Counsel provides no authority that the Ranger's actions constitute a revocation.

As such, the Court finds that the government has satisfied its burden. With respect to Count 12, charge of Violating a Closure pursuant 36 C.F.R. § 1.5(f), the Court finds that Defendant is **GUILTY**.

### B. Permit Violations

Defendant was charged for two violations of 36 C.F.R. § 1.6(g)(2). § 1.6 generally regulates permits within YNP and § 1.6(g)(2) specifically states violating a term or condition of a permit is prohibited. § 1.6 is applicable to Defendant because he has permit to conduct environmental education tours within YNP. On April 29, 2020, Defendant submitted his application for a permit to the YNP Commercial Use Office. Exhibits 7 and 8. He was granted a permit and it was effective on June 10, 2020. Exhibit 9. The permit contains numerous YNP specific conditions and a general condition that he must comply with all applicable laws and regulations of the YNP. At issue are two specific conditions. First, Defendant must ensure all his clients maintain specific distances

from certain animals within YNP. The permit includes a broad statement that regardless of distance, Defendant and his group are too close if any wild animal changes its behavior due to the group's presence. Second, Defendant must not construct any structures, fixtures, or improvements within YNP.

### i.   <u>Count 2</u> – Guiding to Disturb Wildlife

Count 2 of the Information alleges that on June 15, 2020, Defendant violated a special condition of his permit by disturbing a bear in YNP while guiding. Specifically, a video of a bear feeding was posted to Explore's social media accounts. Exhibit 110 and 211. The Explore post said, "[g]uided a small group up to the North Loop in Lamar Valley … [g]ot lucky and caught a Black bear enjoying his lunch today." At trial it was discovered that Ms. Merrell, Defendant's romantic partner, took the video and was responsible for posting it to Explore's social media accounts. The "small group" reportedly guided by Defendant on June 15, 2020, was Ms. Merrell and her son.

The Government's position comes down to three simple points. The Government believes 1) Defendant was guiding Ms. Merrell and her son on June 15, 2020, 2) that the bear changed its behavior, as evidenced by the video, due to Defendant and the small group being too close and 3) those two facts together equate to a violation of Defendant's permit. The Court disagrees.

First, it is clear Defendant was not guiding Ms. Merrell and her son. When the totality of the permit is taken into consideration, it is clear "guiding" is a commercial term. At the very least, to say Defendant was guiding requires he receive some form of payment. Use of the word "guided" in a social media post cannot be used as prima facie evidence that Defendant was in fact guiding. Besides the social media posts, the Government has failed to provide any evidence indicating Defendant's June 12, 2020, trip with Ms. Merrell and her son was anything other than familial in

nature. The Government admitted a Monthly Use Report submitted by Defendant to the Concessions Management Specialist showing he guided four times in the June 2020. That does not prove, beyond a reasonable doubt, that Defendant was guiding on June 12, 2020.

Second, the Court strongly believes in preserving an unimpaired Yellowstone, but wildlife viewing is essential for the enjoyment, education, and inspiration of this and future generations. A mere acknowledgment from a wild animal cannot constitute a change in that animal's behavior significant enough to be attributable to a group's presence. If that were the case, wildlife viewing in YNP would effectively become illegal.

As such, the Court finds that the Government has not satisfied its burden. With respect to Count 2, charge of Guiding to Disturb Wildlife in violation of 36 C.F.R. § 1.6(g)(2), the Court finds that Defendant is **NOT GUILTY**.

ii.   <u>**Count 3 and 13**</u> **– Not Leaving area in Same Condition**

Count 3 and 13 relate to the same alleged wrong committed by Defendant. Count 3 concerns only violations of Defendant's permit, while Count 13 concerns a violation of 36 C.F.R. § 2.1(a)(1)(iv). § 2.1(a)(1)(iv) prohibits possessing, destroying, injuring, defacing, removing, digging, or disturbing from its natural state a mineral resource or cave formation or the parts thereof.

Specifically, Count 3 of the Information alleges that on June 25, 2020, Defendant violated a special condition of his permit by creating a hotpot near Mystic Falls. The Government alleges that by doing so, Defendant violated his permit both by not complying with applicable regulations of YNP and by constructing a structure, fixture, or improvement therewithin.

Count 13 of the Information alleges that, from the same illegal action alleged in Count 3, Defendant violated § 2.1(a)(1)(iv) by moving around rocks to create the hotpot, constituting a

destroying, injuring, digging, or disturbing of the riverbed from its natural state. Defendant implied that the hotpot already existed, he just simply found it and pretended it was his creation but no evidence of this was presented.

Ms. Merrell testified that sometime around June 15, 2020, she was with Defendant and her son hiking near Mystic Falls when they found a "potential hotpot". Around that same time on Explore's social media accounts, Defendant claims to have found a possible new hotpot. Exhibit 102 and 201. On June 20, 2020, on Explore's social media accounts Defendant reports he is going to return to Mystic Falls to see if he can get the hotpot "to work." Sure enough, on June 27, 2020, Defendant posted to Explore's social media accounts a video of him sitting in a hotpot at the base of Mystic Falls. Also on June 27, 2020, Defendant explains exactly how he created the hotpot on his podcast. Exhibit 308. He tells the story of him finding hot water running into the river, discusses that he knew it would need some work, and then with glee announces he "pulled it off". By his own account, he built the hotpot by moving rocks around for about ten minutes. Before ending the podcast, he makes sure to tell his listeners how to find the hotpot, which of course some did. Exhibit 204.

At trial Defendant struggled with the idea that altering riverbeds may result in violations of both his permit and § 2.1. The Court all too often receives similar reactions from defendants in relation to YNP regulations that require you leave the Park as you found it. As a Park who receives more than three million visitors per year, it would be disastrous for Yellowstone if visitors were not prohibited from performing such alterations. What is clear is that Defendant altered the natural landscape to suit his personal desires. Therefore, Defendant's actions constitute a violation of § 2.1(a)(1)(iv). Rocks are surely a mineral resource and moving that mineral resource to form artificial hot pools is a disturbance from natural state.

As such, the Court finds that the Government has satisfied its burden. With respect to Count 13, charge of Unlawfully Possessing, Destroying, Injuring, Defacing, Removing, Digging, or Disturbing a Mineral Resource from its Natural State in violation of 36 C.F.R. § 2.1(a)(1)(iv), the Court finds that Defendant is **GUILTY**.

By way of finding Defendant guilty of violating § 2.1, the Court must find Defendant guilty of Count 3. § 1.6(g)(2), as previously stated, prohibits a permit holder of violating a term or condition of a permit. Defendant has violated at least two express conditions of his permit by creating the hotpot; i.e. by both not complying with applicable YNP regulations and by constructing a structure, fixture, or improvement within YNP.

As such, the Court finds that the Government has satisfied its burden. With respect to Count 3, charge of Not Leaving the Area in the Same Condition as it Was Found in violation of 36 C.F.R. § 1.6(g)(2), the Court finds that Defendant is **GUILTY**.

### iii.   <u>Count 4</u> – Violating a Closure While Guiding

Count 4 is an alleged violation of both 36 C.F.R. § 1.5(f) and § 1.6. As discussed extensively above, the Court has already found Defendant guilty of violating § 1.5(f) on June 25, 2020, in Count 12. The only issue the Court must decide here is whether Defendant was guiding on June 25, 2020. If he was, that would be a clear violation of § 1.6; i.e. violating applicable YNP regulations which is prohibited by his permit.

Much like Count 2, the Government's evidence is weak. In his podcast, Defendant says he had a client with him on June 25, 2020. Exhibit 309. Defendant's Monthly Use Report claims to have had four guided tours in June 2020. The Government believes that proves Defendant was in fact guiding on June 25, 2020. The Court disagrees. Evidence that Defendant used loaded words on a marketing platform does not prove he was guiding. This is particularly true since the Court has

already discovered Defendant uses terms like "guiding" on social media when in reality he was with his romantic partner and her son. The government's case is based solely upon the Defendant's statements that a violation occurred, without any evidence that such violation did in fact occur. Stated differently, no corpus for the crime has been established.  Without more information, such as who this supposed client is or whether the person compensated Defendant, the Court cannot find Defendant guilty of violating § 1.6.

The Court finds that the Government has failed to satisfy its burden. With respect to Count 4, charge of Violating a Closure while Guiding in violation of 36 C.F.R. § 1.6(g)(2), the Court finds that Defendant is **NOT GUILTY**.

### C.  Foot Travel in a Thermal Area

Defendant was charged with numerous violations of 36 C.F.R. § 7.13(j). Counts five, six, seven, eight and nine of the Information are all alleged thermal trespasses. Thermal trespass is simply the walking in a thermal area. § 7.13(j) reads:

> (j) Travel on trails. Foot travel in all thermal areas and within the Yellowstone Canyon between the Upper Falls and Inspiration Point must be confined to boardwalks or trails that are maintained for such travel and are marked by official signs.

36 C.F.R. § 7.13(j)

Thermal trespass is a misdemeanor. The government has the burden of proving every element of this crime beyond a reasonable doubt. The elements of this offense, as applicable to the facts of this matter, are:

1.   The Defendant,

2.   Traveled by foot,

3.   Off a maintained boardwalk or trail marked by official signs,

4.   In a thermal area.

### i.   <u>Count 5 – Shoshone Geyser Basin</u>

*The Defendant*. Defendant's control of Explore's social media accounts, podcast and guidebook have already been established. Count five arises from a picture posted to Facebook on June 22, 2018. Exhibit 32. Defendant shared that post as a Facebook Memory on June 22, 2020. The shared Memory has photos of Defendant. Also, the original post was created by, and has pictures of, Defendant's romantic partner Ms. Merrell. The Court has no doubts Defendant is adequately identified in this Count.

*Traveled by Foot off a Maintained Boardwalk or Trail Marked by Official Signs*. The area in question is in the Shoshone Lake and Shoshone Geyser area of YNP. Ranger Beeny was unable to locate the exact thermal feature due to the Lone Star Fire, but the area is generally known as a backcountry area. As such, there are no maintained boardwalks or marked trails. This element has been satisfied.

*In a Thermal Area*. Thermal Trespass is a never-ending problem here in YNP. For us who call YNP home, it is perplexing why so many seem unable to keep a safe distance from thermal features. Perhaps, that's because we too often get to see the destruction and injuries associated with thermal trespass, while others only see the beauty and find themselves lost in wonder without thought of where they stand or where they walk. Regardless, thermal trespass is illegal in YNP.

The Superintendent's Compendium defines a thermal area as any area where surface manifestations of hot springs, geysers, mud springs, fumaroles or warm ground are present. In YNP the typical surface manifestation, or signs of thermal features for the sake of simplicity, is discoloration and warmth of the surrounding area. In Exhibit 32, it is clear Defendant is standing

on thermal ground. Green grass is all around Defendant in the photo, yet he elected to stand on discolored ground just feet from the thermal feature.

As such, the Court finds that the government has satisfied its burden. With respect to Count 5, charge of Foot Travel in a Thermal Area in violation of 36 C.F.R. § 7.13(j), the Court finds that Defendant is **GUILTY**.

ii.   **Count 6 – Unknown geyser basin**

*The Defendant*. Ranger Beeny testified that Explore's Instagram profile picture was of Defendant standing in a thermal area. The Government attempted to admit an exhibit of this photo, but it was rejected by the Court. Without the photo, Ranger Beeny explained that she believed Defendant was photographed on or about June 11, 2020, in a thermal area within YNP. The Court has no reason to believe, nor was there any argument by Defendant, that Ranger Beeny had misidentified Defendant. The Court, based solely on Ranger Beeny's testimony, finds Defendant is adequately identified in this Count.

*Traveled by Foot off a Maintained Boardwalk or Trail Marked by Official Signs* in *a Thermal Area*. The Court denied admission of Explore's former Instagram profile picture due to a lack of foundation. For the same reasons, the Court must find Defendant not guilty of Count 6. Ranger Beeny testified that she was unable to identify the thermal feature Defendant supposedly was trespassing on. The Government argued that Explore's social media pages only posted photos concerning YNP. However, that is not true. Defendant routinely, using Explore's social media accounts, the podcast and the guidebook, discusses areas outside of YNP. Without knowing where Defendant was at the time of the photo, the Government has failed to prove beyond a reasonable doubt that Defendant thermal trespassed within YNP.

As such, the Court finds that the government has failed to satisfy its burden. With respect to Count 6, charge of Foot Travel in a Thermal Area in violation of 36 C.F.R. § 7.13(j), the Court finds that Defendant is **NOT GUILTY**.

### iii.    <u>Count 7</u> – **Sylvan Springs Group in Gibbon Meadows**

*The Defendant*. The Government alleges Defendant was standing in numerous thermal areas in the Gibbon Meadows area of YNP while taking photos of thermal features. It is the Government's position that photos found within the guidebook and posted to Explore's Facebook account were taken by Defendant. The Government further claims that it would be impossible to take said photos without standing in a thermal area. First, the Court agrees the photographer who took Exhibits 35-39 was in all probability standing in a thermal area. The Court also agrees that at least two of the thermal features depicted in the guidebook are the same thermal features depicted on the Explore's Facebook post. Lastly, its ominous that the guidebook provides detailed directions on how to get to those two thermal features, making it clear Defendant has been to these features. *See* Exhibits 35-37 and Exhibit 1 at pages 58 and 59. However, there is no evidence or testimony suggesting Defendant was the photographer of the pictures in question or that he thermal trespassed. While one can assume he took the photos, it cannot be said beyond a reasonable doubt that Defendant was the photographer.

As such, the Court finds that the government has failed to satisfy its burden. With respect to Count 7, charge of Foot Travel in a Thermal Area in violation of 36 C.F.R. § 7.13(j), the Court finds that Defendant is **NOT GUILTY**.

### iv.    <u>Count 8</u> – **Rabbit Creek**

*The Defendant*. This count is similar to Count 5 in that the alleged illegal activity can be seen in a photo. Exhibit 42 is a photo of Defendant standing near a thermal feature in Rabbit Creek.

Ranger Beeny testified that she found this photo on Explore's Instagram page. Like Count 5, the Court has no question that Defendant is depicted in Exhibit 42.

*Traveled by Foot off a Maintained Boardwalk or Trail Marked by Official Signs*. The thermal feature at issue does not have a maintained boardwalk or trail marked by official signs. This element is satisfied.

*In a Thermal Area*. Like every thermal trespass allegation, the Court must determine if Defendant was in fact in a thermal area. Ranger Beeny testified that she believes this area to be a thermal area, but she has no expertise in thermal features. The definition of thermal area, as provided by the Superintendent's Compendium, includes surface manifestations of mud springs. A mud spring is depicted in Exhibit 42. The question is where exactly Defendant is standing in Exhibit 42.

The Court finds it cannot determine beyond a reasonable doubt that Defendant was standing or walking in a thermal area. Grass, rocks and trees can be seen in the general area where Defendant is standing but the ground at Defendant's feet is not visible in the photo. The Court has no way of telling whether Defendant is standing or walking on the mud spring or any part thereof.

As such, the Court finds that the Government has failed to satisfy its burden. With respect to Count 8, charge of Foot Travel in a Thermal Area in violation of 36 C.F.R. § 7.13(j), the Court finds that Defendant is **NOT GUILTY**.

**v.   Count 9 – Crater Hills Basin**

*The Defendant*. The Government alleges Defendant thermal trespassed at the Crater Hills Basin. Exhibits 213 and 114 are identical videos of a thermal feature that Defendant took. He can be heard speaking in the video. Exhibits 43 and 44 are screenshots of Exhibits 213 and 114 posted to Explore's social media accounts. Defendant also discusses the Crater Hills area, an area he

deems Lime Geyser, in his guidebook. Hearing Defendant's voice, along with the fact that Exhibits 213 and 114 were posted to Explore's social media accounts, and that Defendant discusses the area in his guidebook, convinces the Court that this element has been satisfied.

*Traveled by Foot off a Maintained Boardwalk or Trail Marked by Official Signs*. Ranger Beeny visited the Crater Hills Basin while investigating this count. Exhibits 45 and 49 are photos of the area taken by Ranger Beeny. Exhibits 46-48 are videos Ranger Beeny took of the Crater Hills Basin. All of these exhibits make it very clear that there are no maintained boardwalks or official signs in this area. This element is satisfied.

*In a Thermal Area*. Defendant was unquestionably in a thermal area. While investigating this count, Ranger Beeny was accompanied by a YNP Geologist. The Geologist was able to help Ranger Beeny safely navigate the Crater Basin area. Defendant acknowledges in his guidebook that navigating the Crater Hills Basin is a dangerous task. *See* Exhibit 1 page 60. Despite the obvious danger, Defendant took a video of what he calls Lime Geyser from just feet away. Defendant is so close to the geyser that one can hear it bubbling in Exhibits 213 and 114 as he is talking. That alone tells the Court Defendant was in a thermal area, but the pictures and videos taken by Ranger Beeny clearly establishes Defendant was in the thermal area. Exhibits 45 and 49 make it obvious that nobody could have taken the video Defendant took without being in the thermal area. This element is satisfied.

As such, the Court finds that the Government has satisfy its burden. With respect to Count 9, charge of Foot Travel in a Thermal Area in violation of 36 C.F.R. § 7.13(j), the Court finds that Defendant is **GUILTY**.

## D.  Aiding and Abetting a Closure Violation & Creating a Hazardous Condition

The Government alleges that Defendant aided and abetted a violation of a closure through his actions and comments made to Mr. Johnson on or about July 30, 2020. The Court has discussed § 1.5(f) extensively, it simply prohibits violating a closure within YNP. 18 U.S.C. § 2 states whoever commits or aids, abets, counsels, induces or procures an offense against the United States is punishable as a principal. 18 U.S.C. § 2 does not create an independent crime. Rather, to be guilty as an aider and abettor, it is necessary that Defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, and that he seek by his action to make it succeed." *United States v. McMahon*, 562 F.2d 1192, 1195 (10th Cir. 1977) (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919). The Government must prove that (1) someone committed a crime, and that Defendant (2) willfully associated himself with the criminal venture and (3) sought to make the venture succeed through some action of his own. *United States v. Rosalez*, 711 F.3d 1194, 1205 (10th Cir. 2013).

Mr. Johnson undoubtably committed crimes within YNP. There was evidence, and admissions, that he intentionally violated closures and cliff jumped while within YNP knowing such was illegal. The question, is what did Defendant do to willfully associate himself with the criminal venture and which of Defendant's actions sought to make the venture successful? The only action Defendant arguably took was that of speaking and publishing. Defendant published a guidebook, used social media and created a podcast that all advocated for law violation. Defendant discusses cliff jumping in YNP in both his podcast and his guidebook. Both sources tell people where to cliff jump, what dangers to look out for when doing so, and make it very clear the activity is illegal. Both sources also make it very clear that Defendant disagrees with the illegality and encourages people to do it anyway. Which, after listening to Defendant's podcast and buying his guidebook, is exactly what Mr. Johnson did.

While even speech advocating lawlessness has long enjoyed protections under the First Amendment, it is equally well established that speech which, in its effect, is tantamount to legitimately proscribable nonexpressive conduct may itself be legitimately proscribed, punished, or regulated incidentally to the constitutional enforcement of generally applicable statutes. *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 243 (4th Cir. 1997). The First Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word. *Id*. at 244. Further, there is no need for actual communication between an aider and abettor and the principal or for the aider and abettor to know by whom the crime is actually perpetrated. *Id*.

 In the Government's brief, it quotes much of the same law and argues Defendant's advocacy falls squarely within this "Speech-Act" Doctrine for aiding and abetting in criminal offenses. While persuasive, the Court disagrees in this instance because Defendant's advocacy lacks the required specificity. The *abstract* advocacy of lawlessness is protected speech under the First amendment. *Brandenburg v. Ohio*, 395 U.S. 444, 448, 89 S. Ct. 1827, 1830, 23 L. Ed. 2d 430 (1969) (emphasis added). The Speech-Act Doctrine is implicated when abstract advocacy of lawlessness exceeds its bounds and becomes an effort to detail the means of accomplishing a crime. The case law cited by the Government illustrates the differences between what Defendant has done in this matter and implicates the Speech-Act Doctrine.

In *Rice v. Paladin Enterprises, Inc.*, the Fourth Circuit held that the publisher of a book named *Hit Man: A Technical Manual for Independent Contractors*, a guide focused on successfully soliciting, preparing for, and committing murder for hire, could not rely on the First Amendment as a bar to civil liability. *Rice v. Paladin Enterprises, Inc*., 128 F.3d 233 (4th Cir. 1997). With an incredible depth of analysis, the court found that the book simply exceeded abstract generality and

gave specific advice on how to commit a criminal act. *Id*. at 245. A similar conversation was had by the Ninth Circuit in *United States v. Barnett*, which involved the defendant providing and selling a recipe for PCP. *United States v. Barnett*, 667 F.2d 835 (9th Cir. 1982). The court held that encouraging and counseling another by providing specific information as to how to commit a complex crime does not alone constitute aiding and abetting. *Id*. at 841. If, however, the person so assisted or incited, commits the crime he was encouraged to perpetrate, his counselor is guilty of aiding and abetting. *Id*. The court quickly found that specific information was provided by the defendant, instead the focus of the court was whether a crime was eventually perpetrated.[3]

Similar requirements of specificity can be found in the tax cases cited by the Government. In *U.S. v. Kelley*, the defendant was charged with conspiring to defraud the federal government and of aiding and assisting in the preparation of false W-4 forms. *United States v. Kelley*, 769 F.2d 215, 216 (4th Cir. 1985). The defendant charged people membership fees for advice on how to avoid income tax withholdings and how to obtain refunds of previously withheld wages. *Id*. He also provided forms and gave detailed instructions as to how those forms should be filled out. *Id*. The Fourth Circuit found that no abstract discussion could be found, but rather specific advice was given to further an illegal undertaking.

With respect to Defendant, his actions are more akin to an abstract objection to YNP regulations. Defendant regularly informs listeners and readers of activities in the park that are illegal, gives a history of how that illegality came about and then makes it clear he oppose the rules

---

[3] The Government also cites on *United States v. Allen*, 139 F.3d 913 (10th Cir. 1998). In *Allen*, the Tenth Circuit provides three sentences explaining that the defendant's convictions of obstruction of justice were proper because the First Amendment does not provide a defense to criminal charges simply because the defendant used the written or spoken word to encourage and counsel others to commit crimes. *Id*. at 2. While the opinion cites *Brandenburg*, *Barnett* and *Allen*, it is not dispositive of the matter at hand.

and encourages listeners to violate them. From all the evidence before the Court, its clear Defendant believes "exploring Yellowstone like a local" is synonymous with exploring Yellowstone before extensive regulatory schemes and protections were implemented. The overall encouragement heard by Defendant fits more squarely in protected speech as abstract advocacy of lawlessness than it does detailed instructions on how to commit a crime.

Admittedly, the Government's position is not unreasonable and Defendant's conduct is not praise worthy. Defendant does provide some details, both in his podcast and guidebook, where cliffs can be found and that cliff jumping is illegal. He strongly advocates, multiple times, that visitors should cliff jump despite being a violation of park rules and encourages them to do so when Park Rangers are not in the area.

However, at the most basic level, all Defendant has done is provide information as to where cliffs are and why he believes people should ignore rules prohibiting jumping off those cliffs. Defendant has not provided a detailed account on how to commit a crime. The cliffs are well known within Yellowstone National Park and located at a swimming location where swimming is approved by the Park.[4] He has not given a time of day when one would be most likely to avoid Park Rangers. He has not actively helped listeners or readers avoid detection by keeping lookout or by organizing coconspirators to do so. Without specificity raising Defendant's words beyond that of abstract advocacy of lawlessness, the Court cannot find him guilty of Count 10.

As such, the Court finds that the Government has failed to satisfy its burden. With respect to Count 10, charge of Aiding and Abetting a Closure Violation prohibited by 36 C.F.R. § 1.5(f) and 18 U.S.C. § 2, the Court finds that Defendant is **NOT GUILTY**.

---

[4] The swimming area was closed in the summer of 2020 due to COVID-19 restrictions.

For similar reasons, Defendant must be found not guilty on Count 14. Count 14 alleges a violation of 36 C.F.R. § 2.34(a)(4), which states a person commits disorderly conduct when, with a specific intent, he or she creates or maintains a hazardous or physically offensive condition. The Court has already dispensed with the Government's claim that Defendant aided and abetted cliff jumping activities, which is the underlying conduct the Government uses to justify Count 14. Further, the Court seriously doubts one may be found guilty of creating a hazardous condition, i.e. cliff jumping, while in the same breath discussing the horrific injuries that may follow. Objecting to a dangerous activity's illegality, but at the same time explaining the dangers that led to the illegal designation, cannot constitute creating a hazardous or physically offensive condition.

As such, the Court finds that the Government has failed to satisfy its burden. With respect to Count 14, charge of Aiding and Abetting a Closure Violation prohibited by 36 C.F.R. § 1.5(f) and 18 U.S.C. § 2, the Court finds that Defendant is **NOT GUILTY**

### E.  Engaged in Activity Subject to a Permit Without Obtaining a Permit

Count 15 alleges Defendant violated 36 C.F.R. § 1.6(g)(1). Said section provides that engaging in an activity subject to a permit is prohibited without first obtaining a permit. 36 C.F.R. § 1.6(g)(1). On June 10, 2020, Defendant's guiding permit was authorized and legally effective. Exhibit 9. Defendant self-reported guiding four trip within YNP in the month of June 2020. Exhibit 11. The Government alleges one of those guided trips reported by Defendant was with Mr. Fana and his family on June 2, 2020, just days before his guiding permit was valid.

The Court again must determine if Defendant was "guiding" in a sense that violates § 1.6(g)(1). There is no evidence that the trip with Mr. Fana in YNP was one of the four guided trips reported by Defendant. The Government relies on yet another Explore social media post using the loaded

word "guided" in reference to Defendant's day with Mr. Fana. This time, though, the Court finds that Defendant was guiding.

In Count 2, the Court refused to extend the commercial nature of guiding to a familial trip just because Defendant used a loaded word on social media. In Count 4, the Court refused to find Defendant was guiding without evidence suggesting as much. With respect to Mr. Fana, the scenario is much different. Mr. Fana purchased Defendant's guidebook, listened to his podcast, and communicated with Defendant via text and social media. Mr. Fana did not know Defendant prior to discovering Defendant's guiding business and related marketing tools in preparation for a vacation. Mr. Fana claims he did not pay Defendant for the trip on June 2, 2020. A fact Defendant believes is critical in finding him not guilty of illegal guiding. But, Mr. Fana had already purchased Defendant's guidebook and began interacting with all of Explore's social media accounts. There was testimony that days later Mr. Fana bought Defendant drinks and may have purchased dinner for Defendant and Ms. Merrell. Although, unimpressively, Mr. Fana could not definitively confirm or deny he had done so.

The Court is convinced that June 2, 2020, was not a casual trip unrelated to Defendant's commercial aspirations as a guide. If the Court were to accept Defendant's argument, guides within YNP could avoid being labeled exactly that, and avoid liability with such a label, simply by requiring customers to purchase guiding materials rather than pay them a guiding fee. Defendant guided Mr. Fana and his family on June 2, 2020, despite not being legally allowed to do so until June 10, 2020.

As such, the Court finds that the Government has satisfied its burden. With respect to Count 15, charge of Engaged in Activity Subject to a Permit Without Obtaining a Permit prohibited by 36 C.F.R. § § 1.6(g)(1), the Court finds that Defendant is **GUILTY.**

Defendant made a motion to dismiss some Counts during the trial which was taken under advisement.  That motion is hereby **DENIED** for the reasons set forth in this order.

Dated this 24th day of May, 2021.

_____
MARK L. CARMAN
UNITED STATES MAGISTRATE JUDGE